1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8
9
10
11
12

UNITED STATES OF AMERICA,

Plaintiff,

v.

CLYDE MCKNIGHT, a/k/a "Pizza,"
and PATRICK TABLES, a/k/a "Break
Bread,"

Defendants.

CR18-16 TSZ

ORDER

13    THIS MATTER comes before the Court on defendant Patrick Tables's motion

14 to suppress, docket no. 124, defendant Clyde McKnight's motion to suppress, docket

15 no. 129, and the deferred portion of a motion to compel discovery brought jointly by

16 Tables and McKnight, docket no. 149.  Having reviewed all papers filed in support of,

17 and in opposition to, the motions, and having considered the testimony and exhibits

18 admitted during the hearing conducted on February 20, 2019, pursuant to _Franks v._

19 _Delaware_, 438 U.S. 154 (1978), the Court enters the following order, which sets forth the

20 Court's findings of fact and conclusions of law.[1]

21
22
23

---

[1] Any finding of fact misidentified as a conclusion of law shall be deemed a finding of fact, and
any conclusion of law misidentified as a finding of fact shall be deemed a conclusion of law.

ORDER - 1

**Background**

On November 1, 2017, United States Drug Enforcement Administration ("DEA") Special Agent Kevin Palermo successfully applied for a warrant to install tracking devices on three vehicles, namely:

- Target Vehicle 1 ("TV-1"), a white Maserati sedan registered to Tables;
- Target Vehicle 2 ("TV-2"), a blue Tesla hatchback registered to McKnight; and
- Target Vehicle 3 ("TV-3"), a blue Dodge minivan.

*See* Ex. A to McKnight's Mot. (docket no. 129-2). Thereafter, Palermo obtained at least three other tracking warrants, on December 1, 2017, December 19, 2017, and December 21, 2017, respectively, and three search warrants, on January 3, 2018, January 4, 2018, and January 25, 2018, respectively. *See* Exs. F, G, L, M, N, & P to McKnight's Mot. (docket nos. 129-7, 129-8, 129-13, 129-14, 129-15, & 129-17). DEA Special Agent Geoffrey Provenzale procured another search warrant on January 4, 2018. Ex. O to McKnight's Mot. (docket no. 129-16). Tables seeks to suppress the evidence acquired as a result of the November 1, 2017, tracking warrant, and McKnight has moved to exclude the fruits of all eight warrants. McKnight separately contends that the impoundment of one of his vehicles, a black Chrysler 300, designated as Target Vehicle 7 ("TV-7"), constituted an illegal warrantless seizure, and that the controlled substances later found in the vehicle pursuant to a search warrant should be suppressed.

**A.    Palermo's Affidavit dated November 1, 2017**

In his affidavit submitted in support of the first tracking warrant in this matter, Palermo indicated that, during the period from mid to late September 2017, investigators observed McKnight and an individual who later became a confidential source ("CS-1")

conduct a "hand to hand" transaction near First Avenue and Columbia Street in Seattle. Ex. A to McKnight's Mot. (docket no. 129-2). McKnight then walked to his blue Tesla hatchback (TV-2). *Id.* He was subsequently seen exiting the Tesla, meeting with a number of unidentified males on the street corner, and conducting several "hand to hand" transactions. *Id.* McKnight returned to TV-2 and left the area. *Id.*

Approximately a week later, CS-1 was seen conducting several "hand to hand" transactions. *Id.* Officers stopped CS-1, found "user amounts" of narcotics on his/her person, and signed him/her up as a confidential source. *Id.* According to Palermo's affidavit, CS-1 told investigators that, when he/she had been surveilled the week before, he/she bought narcotics from McKnight, that McKnight was the "top dealer" in the Pioneer Square area, and that McKnight's nickname was "Pizza" because he "always delivers." *Id.*

Palermo's affidavit further stated that, on September 27, 2017, investigators observed Tables driving a black Mercedes sedan, with Washington license number "BGK1908." *Id.* The black Mercedes sedan parked behind a blue 2005 Dodge minivan (TV-3). *Id.* At the time, co-defendant Michael Turner was standing outside TV-3. *Id.* Tables exited the black Mercedes sedan, got in TV-3 with Turner, met for a brief period, and then went back to the black Mercedes sedan. *Id.* An unknown female later entered the black Mercedes sedan, met with Tables for about five minutes, exited the vehicle, and then conducted "hand to hand" transactions with multiple individuals at the homeless encampment on Alaskan Way under the viaduct. *Id.*

On October 6, 2017, officers observed Tables park the black Mercedes sedan overnight at the Hidden Harbor House Apartments in Des Moines, and on October 12, 2017, they confirmed that Tables rented a unit in that apartment building. _Id._ On October 17, 2017, CS-1 told investigators that Tables had switched cars and was driving the white Maserati sedan designated as TV-1. _Id._ On October 18, 2017, officers saw Tables driving TV-1. _Id._ On October 19, 2017, officers observed TV-1 parked in the lot at the Hidden Harbor House Apartments, where the black Mercedes sedan had previously been parked. _Id._ A "sniff" performed by Task Force Officer ("TFO") Matt Bruch and his K9 partner "Lilly" was positive for narcotics odor at the driver's door of TV-1. _Id._ K9 Lilly also detected the scent of controlled substances near three of the doors of TV-3, in which Tables had previously met with Turner. _Id._

**B.      Palermo's Subsequent Affidavits**

**1.      Target Telephones 1 and 2**

In his affidavit dated December 1, 2017, Palermo repeated the information set forth in his November 2017 affidavit and added that CS-1's cell phone contained a number associated with "Pizza," which was designated as Target Telephone 1 ("TT-1"). Ex. F to McKnight's Mot. (docket no. 129-7). At the end of November 2017, officers identified another number for McKnight, designated as Target Telephone 2 ("TT-2"), which McKnight had provided to automobile service providers. _Id._ Based in part on calls made by McKnight's former girlfriend, Mary Rodriguez, to TT-1 while she was in custody in the King County Jail, and the similar call histories of TT-1 and TT-2, which

indicated that McKnight was using both devices, a warrant was issued to track the locations of both cell phones.

## 2. **Tracking Devices on Other Vehicles**

In his affidavit dated December 19, 2017, Palermo indicated that, in early December 2017, McKnight was seen driving a white Lexus CT, designated as Target Vehicle 4 ("TV-4"), and on December 12, 2017, McKnight was observed driving a white BMW 650, designated as Target Vehicle 5 ("TV-5"). Ex. G to McKnight's Mot. (docket no. 129-8). TV-4 and TV-5 were registered to persons other than McKnight. _Id._ TFO Troy Swanson and his K9 partner "Belle" conducted a "sniff" of TV-5, which was positive for the presence of narcotics odor. _Id._

Palermo also discussed in his affidavit dated December 19, 2017, McKnight's black Chrysler 300 (TV-7). According to Palermo, back in April 2017, McKnight had been driving TV-7 when he was arrested for a domestic violence ("DV") offense. _Id._ On December 12, 2017, TV-7 was discovered parked in the Mt. Baker neighborhood. _Id._ TV-7 was registered to McKnight at an address in the Mt. Baker neighborhood (namely, 2811 31st Avenue South). _Id._ K9 Lilly detected the odor of narcotics at the driver's door seam of TV-7. _Id._

Palermo explained in his affidavit dated December 19, 2017, that drug traffickers commonly use vehicles to both store and transport controlled substances, and he opined from the surveillance and K9 "sniff" results that TV-4, TV-5, and TV-7 were being used to facilitate narcotics transactions. _Id._ A warrant authorizing the installation of tracking devices on TV-4, TV-5, and TV-7 was issued.

### 3.    <u>Search of Chrysler 300 (TV-7)</u>

According to Palermo's affidavit dated January 3, 2018, investigators tracked TV-4 to an area where McKnight's black Chrysler 300 (TV-7) was parked. Ex. M to McKnight's Mot. (docket no. 129-14). McKnight was seen exiting TV-4 and accessing the trunk of TV-7. <u>Id.</u> After retrieving a backpack from the trunk of TV-7, McKnight got in TV-4 and drove away. <u>Id.</u> When McKnight returned to the location of TV-7, he placed a box in the trunk of TV-7. <u>Id.</u> He got in TV-7, exited, and retrieved a different item from the trunk of TV-7, which he took to the engine compartment before returning it to the trunk. <u>Id.</u> He then drove away in TV-7, which was tracked to the 3200 block of South College Street. <u>Id.</u> On January 2, 2018, TV-7 was removed from the street and taken to a secure Seattle Police Department ("SPD") lot. <u>Id.</u> In his affidavit submitted the next day, January 3, 2018, Palermo opined that TV-7 contained a mobile stash of narcotics. <u>Id.</u> Based on Palermo's affidavit, a warrant to search TV-7 was issued. On January 25, 2018, Palermo sought yet another search warrant for McKnight's black Chrysler 300 (TV-7) to permit investigators to seize items that had been observed in the vehicle but were beyond the scope of the previous search warrant. Ex. P to McKnight's Mot. (docket no. 129-17).

### 4.    <u>Search Conducted in Portland</u>

On January 4, 2018, Palermo applied for another search warrant, this time for a hotel room and for TV-5. According to his affidavit, the search of TV-7, which was authorized by the warrant issued the prior day, revealed 744 grams of crack cocaine, 3,703 grams of powder cocaine, and 1,979 grams of heroin. <u>See</u> Ex. N to McKnight's

Mot. (docket no. 129-15). After TV-7 had been impounded, McKnight made multiple calls to SPD inquiring about the location of the vehicle. *Id.* He then apparently fled the district. Pursuant to the previous tracking warrants, the white BMW 650 (TV-5) and one of McKnight's cell phones (TT-2) were located at the Best Western / Pony Soldier Inn in Portland, Oregon, where security footage showed McKnight and a known associate, Meiko Drew, accessing Room No. 227. *Id.*

**C.  Provenzale's Affidavit**

While Palermo was executing the search warrant issued for Room No. 227 at the Best Western in Portland, Provenzale successfully applied for a warrant to search TV-2, TV-4, and Unit No. 406 at the Landes Apartments in Seattle. Provenzale's affidavit repeated information set forth in Palermo's prior affidavits, and added that Unit No. 406 at the Landes Apartments was leased by Tyisha Barrett, the niece of one of McKnight's associates. *See* Ex. O to McKnight's Mot. (docket no. 129-16). Investigators had observed McKnight's blue Tesla hatchback (TV-2) parked in the secured garage at the Landes Apartments, in the space assigned to Unit No. 406. *Id.* Officers had also seen TV-4, which McKnight had been driving, parked in an adjacent parking lot for the Landes Apartments. *Id.* McKnight does not accuse Provenzale of independently making misrepresentations in his affidavit, but because Provenzale copied information from Palermo's prior affidavits, some of Palermo's mistakes were repeated by Provenzale.

**D.  Motion to Compel**

By letter dated November 29, 2018, the Government informed Tables's and McKnight's lawyers that it did not intend to call CS-1 as a witness at trial. Ex. B to

Defs.' Mot. to Compel (docket no. 149-2).  The Government further disclosed that CS-1

had received six payments of either $100 or $200 each, for a total of $800, in connection

with this case, was not charged for the narcotics found in his/her possession in September

2017, has completed the cooperation agreement with SPD, and is no longer a confidential

source.  *Id.*  In January 2019, Tables and McKnight sought the following information

concerning CS-1:  (i) identity; (ii) criminal history; (iii) jail and prison records; (iv) post-

conviction supervision records; (v) ongoing criminal investigations; (vi) prior bad acts;

(vii) promises or consideration given; (viii) threats made or other coercion used; (ix) prior

testimony; and (x) capacity to testify.  The Court granted Tables's and McKnight's

motion to compel in part and directed the Government to produce a redacted version of

the cooperation agreement between CS-1 and SPD, but otherwise deferred ruling on the

motion.  *See* Minute Order (docket no. 162).

**Discussion**

**A.    Applicable Standards**

    **1.    Evidentiary Hearing**

An evidentiary hearing on a motion to suppress need not be conducted when the

moving papers fail to identify contested issues of fact.  *See United States v. Cook*, 808

F.3d 1195, 1201 (9th Cir. 2015).  An evidentiary hearing concerning a challenge to an

affidavit supporting a warrant is required only (i) when a defendant makes a "substantial

preliminary showing that a false statement knowingly and intentionally, or with reckless

disregard for the truth, was included by the affiant in the warrant affidavit," and (ii) if the

affidavit does not support a finding of probable cause when the alleged false statement is

disregarded or the omitted information is included. _Franks_, 438 U.S. at 155-56 & 171-72. In this matter, an evidentiary hearing was conducted pursuant to _Franks_, but the Court CONCLUDES that an evidentiary hearing with respect to the pending motions to suppress is otherwise unnecessary because the motions identify no disputed facts beyond those addressed in connection with the warrant affidavits at issue.

### 2. **Warrant Affidavits**

A presumption of validity attaches to an affidavit supporting a warrant issued by a judicial officer. _Franks_, 438 U.S. at 171. To challenge a warrant affidavit, a defendant must prove, by way of "sworn or otherwise reliable statements of witnesses," that the affiant engaged in either "deliberate falsehood" or "reckless disregard for the truth." _Id._ "Allegations of negligence or innocent mistake are insufficient." _Id._ Under _Franks_, the only impeachment permitted is of the affiant, and "not of any nongovernmental informant." _Id._; _United States v. DiCesare_, 765 F.2d 890, 895 (9th Cir. 1985); _see also United States v. Perdomo_, 800 F.2d 916, 921 (9th Cir. 1986). To invalidate a warrant, the defendant must show that the misrepresentations or omissions of the affidavit were "essential to the finding of probable cause." _United States v. Dozier_, 844 F.2d 701, 705 (9th Cir. 1988).

### 3. **Probable Cause**

Probable cause "means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." _United States v. Garcia-Villalba_, 585 F.3d 1223, 1233 (9th Cir. 2009) (quoting _United States v. Hill_, 459 F.3d 966, 970 (9th Cir. 2006)). Probable cause is "a flexible, common-sense standard." _Texas v. Brown_,

460 U.S. 730, 742 (1983). "It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." *Id.* (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

A court's "after-the-fact scrutiny" concerning the sufficiency of a warrant affidavit "should not take the form of *de novo* review." *Illinois v. Gates*, 462 U.S. 213, 236 (1983). Rather, a magistrate's determination of probable cause is entitled to "great deference" by a reviewing court. *Id.* A "grudging or negative attitude" toward warrants is inconsistent with the Fourth Amendment's strong preference that searches be conducted pursuant to warrants, and courts should not interpret warrant affidavits in a "hypertechnical, rather than a commonsense, manner." *Id.* (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). In considering a challenge to a warrant, the reviewing court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238-39 (alteration in original).

### 4. **Discovery Regarding Confidential Sources**

In connection with a *Franks* proceeding, a defendant is "*sometimes* entitled to disclosure of the informant's identity, but only after 'mak[ing] specific allegations that indicate the portions of the warrant claimed to be false' and making 'a contention of deliberate falsehood or reckless disregard for the truth.'" *United States v. Rowland*, 464

F.3d 899, 909 (9th Cir. 2006) (emphasis and alterations in original).  The right is not

absolute, and no fixed rules or bright lines have been articulated by courts.  *See id.*  The

issue calls for "balancing the public interest in protecting the flow of information against

the individual's right to prepare his defense."  *Id.*  The Court must examine the particular

circumstances of each case, "taking into consideration that crime charged, the possible

defenses, the possible significance of the informer's testimony, and other relevant

factors," and the defendant's need for identifying information must be weighed against

the value of ensuring the informant's safety.  *Id.*; *see also McCray v. Illinois*, 386 U.S.

300, 307-08 (1967) (holding that an Illinois evidentiary rule, which permitted officers to

testify about what a confidential source told them, without disclosing the identity of the

informant, did not violate the due process or confrontation clauses of the Constitution).

**B.      Tables's Motion to Suppress (docket no. 124)**

In his motion, Tables challenges only Palermo's affidavit dated November 1,

2017, asserting that it was defective in four ways:  (1) it omitted the fact that Tables was

in King County Superior Court's "drug court," was in drug treatment, and was a known

drug user; (2) it incorrectly identified a vehicle used by Tables as a black Mercedes sedan

rather than a silver Mercedes coupe; (3) it did not indicate where and when K9 Lilly's

"sniff" of Tables's white Maserati (TV-1) occurred; and (4) it failed to disclose that CS-1

had prior state court convictions for manufacturing or delivering controlled substances.

Tables contends that a "corrected" affidavit would not support a finding of probable

cause to issue a tracking warrant for TV-1.  *See Franks*, 438 U.S. at 171-72 (indicating

1  that the proper inquiry is whether the affidavit supports a finding of probable cause when

2  any false statement is disregarded and any omitted information is included).

3       **1.**    <u>**Drug Court**</u>

4      With regard to Tables's participation in King County Superior Court's "drug

5  court" and/or drug treatment, Tables has offered no evidence that Palermo knew this

6  information or deliberately omitted it from his affidavit.  Indeed, Palermo has testified

7  that, at the time he prepared his affidavit dated November 1, 2017, he was unaware of the

8  status of the pending criminal matter for which Tables had opted into "drug court."

9  Tables's suggestion that Palermo was reckless in not further investigating the related

10  arrest, which appeared on Tables's National Crime Information Center ("NCIC") report

11  with a status of "disposition not received," has no merit.  Tables has offered no basis for

12  his contention that "disposition not received" necessarily means that an arrest has ripened

13  into charges that have not yet resulted in a conviction or that law enforcement officers

14  routinely follow up on such gaps in NCIC reports or are required to do so.  Moreover, the

15  absence of facts about Tables's drug use and pursuit of treatment did not affect the

16  probable cause determination.  Tables's drug use would not have negated probable cause

17  to believe Table was selling narcotics.[2]

18

19  ────────────────

20  [2] During the <u>*Franks*</u> hearing, Palermo testified that, had he known about Tables's participation in "drug court," he would have included such information in his affidavit because he believes that it would have further supported probable cause.  Palermo explained that, to remain in "drug court,"

21  Tables was required to undergo two urinalysis ("UA") tests per week, and that his continued participation in "drug court" would have supported an inference that his UA's were negative and

22  that Tables's conduct, as described in Palermo's affidavit, as well as the odor of narcotics emanating from his vehicle, were consistent with distribution, as opposed to merely personal use,

23  of controlled substances.

### 2. <u>Tables's Mercedes</u>

With regard to the black Mercedes sedan linked to Tables in Palermo's affidavit dated November 1, 2017, the Court concludes that Tables has not shown the affidavit was in any way inaccurate or that Palermo engaged in any deliberate falsehood or reckless disregard for the truth. The affidavit undisputedly recites the correct make (Mercedes), year (2010), and license number (BGK1908). *See* Ex. C to Tables's Mot. (docket no. 124-3). Tables's assertion that a sedan necessarily has four doors, while the vehicle at issue has only two doors, is unsupported by any evidence or authority. Palermo testified that a sedan can have four or two doors, and the dictionary meaning of sedan is consistent with Palermo's testimony. *See* Webster's 3d New Int'l Dictionary 2054 (1981) (defining "sedan" as "an automobile having four or two doors"). Finally, as reflected in photographs of the car, *see* Gov't Ex. 3, in low light situations, the color appears to be black, as opposed to silver or gray, and the surveillance report on which Palermo relied in preparing his affidavit indicated that, on September 27, 2017, at 2317 hours, Tables arrived in the area of Occidental Avenue and South Washington Street in a black Mercedes with license number BGK1908. *See* Ex. C to McKnight's Mot. (docket no. 129-4 at 3).

### 3. <u>Timing of K9 "Sniff"</u>

With regard to the timing of K9 Lilly's "sniff" of Tables's white Maserati (TV-1), the Court concludes that, contrary to Tables's argument, no additional information was required in the warrant affidavit. The "sniff" at issue was based on observations between October 17 and October 19, 2017. It must have occurred sometime between October 19,

2017, when officers observed TV-1 parked at Tables's residence, and November 1, 2017, when Palermo signed his affidavit in support of the tracking warrant.[3]  The Court finds that the "sniff" would not have become unconstitutionally "stale" during this less than two week period.  *See United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (staleness must be evaluated "in light of the particular facts of the case and the nature of the criminal activity and property sought" and, with respect to drug trafficking, "probable cause may continue for several weeks, *if not months*, of the last reported instance of suspect activity" (emphasis in original)); *see also United States v. Leasure*, 319 F.3d 1092, 1099 (9th Cir. 2003); *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th Cir. 1989).

### 4.    CS-1's Criminal History

With regard to CS-1's criminal history, the Court finds that Palermo made an innocent mistake.  In his affidavit dated November 1, 2017, Palermo stated that CS-1 had a conviction for residential burglary and a conviction for robbery, both of which were more than seven years old, and multiple narcotics arrests that had not resulted in a conviction.  Ex. A to McKnight's Mot. (docket no. 129-2).  During the *Franks* hearing, Palermo testified that he misinterpreted CS-1's Washington State Criminal History Record, Ex. B to McKnight's Mot. (docket no. 129-3), which indicated that a drug charge associated with an arrest in September 2016 was dismissed with prejudice in October

---

[3] During the *Franks* hearing, counsel for Tables suggested that the location at which TV-1 was parked at the time of the "sniff" was not a public place and that the warrantless "sniff" violated the Fourth Amendment.  Palermo, however, testified that the parking lot at issue was open to the public, and Tables offered no contrary evidence.

2016.  Palermo acknowledged that a different arrest of CS-1, in November 2014, ripened into at least one conviction, and perhaps two convictions, for manufacturing or delivering a controlled substance.  The Court finds credible Palermo's explanation for how the error occurred, and concludes that Palermo did not deliberately falsify CS-1's criminal history or act in reckless disregard for the truth.

Moreover, even if Palermo acted with the requisite ill intent or recklessly omitted CS-1's drug felonies from his affidavit, and even if the absent convictions are considered in evaluating whether probable cause supported the tracking warrant for TV-1, the affidavit remains sufficient.  With respect to TV-1, the only information derived from CS-1 was the fact that Tables had switched cars.  TV-1, however, was registered to Tables, and officers independently observed TV-1 parked in the lot of the Hidden Harbor House Apartments, where Tables resided, in the same location where the black Mercedes sedan that he had been driving had previously been parked.  Thus, even if CS-1's credibility would have been undermined by his/her prior convictions, enough other evidence linked TV-1 to Tables.

### 5.  **Probable Cause**

The observations of investigators, including that Tables had met in the black Mercedes sedan with a woman shortly before she began engaging in suspected drug transactions and that the odor of narcotics was emanating from Tables's new vehicle (TV-1), as well as from the car in which Tables had met with Turner (TV-3), provided probable cause to believe that TV-1 was being used in or might contain or lead to

evidence of a crime. For all of the foregoing reasons, Tables's motion to suppress, docket no. 124, is DENIED.

**C.  McKnight's Motion to Suppress (docket no. 129)**

In his motion to suppress, McKnight asserts that the various warrant affidavits contain the following misstatements and/or omissions:  (1) misrepresentations concerning CS-1's criminal history and about CS-1's statements to officers; (2) misidentifications of two of the several vehicles involved in this matter; (3) certain typographical errors; (4) misrepresentations regarding K9 Lilly's qualifications; (5) misrepresentations about McKnight's place of residence; and (6) misrepresentations about McKnight's behavior on January 2, 2018, with respect to TV-7, namely a failure to disclose that McKnight was trying to jump start the vehicle (as opposed to using it to store and/or transport narcotics). McKnight also argues that the impoundment of TV-7 was an unconstitutional warrantless seizure, and that the various warrants are unsupported by probable cause.

**1.  CS-1's Criminal History, Statements, and Payments**

In addition to the lack of full disclosure about CS-1's criminal history, which was also raised by Tables, McKnight asserts that Palermo misrepresented what CS-1 told SPD officers and failed to disclose that CS-1 was being paid for information. As explained earlier, the Court finds credible Palermo's explanation for why CS-1's felony drug convictions were not included in his affidavits. The Court is not persuaded that Palermo's affidavits were otherwise inaccurate with regard to CS-1.

In notes prepared by SPD Officer Stephen Knapp, CS-1 was reported to have "immediately identified 'Pizza,' 'Ezy,' and 'Break Bread,' as the main crew supplying

the crack to street users in Pioneer Square." Ex. D to McKnight's Mot. (docket

no. 129-5).[4]  CS-1 knew the street monikers, but not the actual identities, of these

individuals; however, Knapp was already aware that "Pizza" was McKnight, "Ezy" was

Turner, and "Break Bread" was Tables.  _Id._  McKnight's assertion that CS-1 identified

McKnight solely as "Ru Ru," and not as "Pizza," is unsupported by the evidence that

McKnight himself has proffered.

Knapp's notes also indicated that CS-1 admitted that he/she was "selling street

level amounts of crack cocaine."  _Id._  Although this admission was not explicitly

disclosed in Palermo's affidavits, the investigators' observations of CS-1 engaging in

several "hand to hand" transactions, which were consistent with the distribution of

narcotics, were described in Palermo's affidavits.

---

[4] After the _Franks_ hearing, counsel for McKnight filed over 460 pages of materials, which are contained in Exhibits A and B to his supplement, indicating that he had neglected to make these documents part of the record.  _See_ McKnight's Supp. (docket no. 167).  The Government has objected to this practice.  _See_ Resp. (docket no. 169).  The text messages (Bates Nos. 009020-009482) contained in Exhibit A to McKnight's supplement had been marked as Exhibit B-17 for the _Franks_ hearing, but no witness was asked about such exhibit and it was not offered or admitted.  The Court has nevertheless considered the three pages, Bates Nos. 009459, 009460, and 009465, from Exhibit B-17 that are highlighted in McKnight's supplement.  Acting pro se, McKnight has also referenced Bates Nos. 009459 and 009460, as well as Bates No. 009461, in a document that he submitted to the Court, docket no. 171, apparently without his lawyer's knowledge or assistance, arguing that these text messages establish governmental misconduct. The Court has considered McKnight's pro se "supplemental request" and hereby concludes that the text messages at issue do not evidence misconduct on the part of the Government or its witnesses.  The Court has also considered Exhibit B to the supplement filed by McKnight's lawyer, which is a single page from Knapp's report (Bates No. 004036) that repeats the above-quoted statement from Knapp's notes (Bates No. 004034, Ex. D to McKnight's Mot. (docket no. 129-5)), indicating CS-1 "immediately identified 'Pizza,' 'Ezy,' and 'Break Bread' as the main crew supplying the crack to street users in Pioneer Square."  _See_ Ex. B to McKnight's Supp. (docket no. 167-3).

Knapp's notes do not describe any payments made to CS-1, _see_ _id._, and no evidence has been presented that, at the time Palermo was seeking the various warrants at issue, he knew about the sums given to CS-1 between October 5, 2017, and February 28, 2018.  _See_ Ex. B to Defs.' Mot. to Compel (docket no. 149-2).  At the _Franks_ hearing, Palermo testified that his understanding in the fall of 2017 was that CS-1 was attempting to "work off" potential charges, and Palermo's warrant affidavits indicated that CS-1 was "assisting law enforcement for charging considerations."  _E.g._, Ex. A to McKnight's Mot. (docket no. 129-2).

The Court finds that Palermo did not deliberately falsify any representations about CS-1 or act in reckless disregard for the truth.  Even if, however, Palermo deliberately distorted or recklessly omitted from his affidavits CS-1's criminal history, statements, including his/her admission of distributing narcotics, and/or payments, and even if any errors are rectified in connection with the Court's evaluation of whether probable cause supported the various warrants, McKnight is not entitled to the relief he seeks.  _See_ _Franks_, 438 U.S. at 171-72 (indicating that the proper inquiry is whether the affidavit supports a finding of probable cause when any false statement is disregarded and any omitted information is included).  A reasonable inference from the facts actually stated in Palermo's affidavits is that CS-1 was selling drugs and was motivated by personal interest to provide information about McKnight and others.  The omitted criminal history, admission of drug dealing, and payments would merely have confirmed such inference.  Thus, the omissions were not "essential" to the finding of probable cause and do not meet the standard for suppression of the evidence derived as a result of the related warrants.

## 2. Vehicle Descriptions

McKnight joins in Tables's arguments concerning the black Mercedes sedan, and the Court rejects those arguments for the reasons discussed earlier. McKnight also raises an issue about Palermo's description of TV-2. In his affidavit dated November 1, 2017, Palermo identified TV-2 as a 2014 Tesla. Ex. A to McKnight's Mot. (docket no. 129-2). The year of the vehicle should have been 2016. Indeed, in a subsequent affidavit dated November 17, 2017, Palermo disclosed that the year of the Tesla had been incorrectly stated as 2014 instead of 2016. Gov't Ex. 2 at 4 n.1. During the _Franks_ hearing, Palermo explained that, at the time he prepared his first affidavit, two similar cars were registered in McKnight's name, a 2014 Tesla and a 2016 Tesla, and that the years accidentally got transposed, but all of the other information about TV-2 was correct, including the color, license number (BGX8830), and vehicle identification number ("VIN"). Palermo further testified that, despite the footnote in his affidavit dated November 17, 2017, he used a "copy and paste" method for later affidavits that propagated the error in his affidavit dated November 1, 2017. The Court finds that Palermo's mistakes were innocent and not grounds for invalidating the warrants at issue.

## 3. Typographical Errors

McKnight contends that Palermo erred in stating that McKnight owned "two high end vehicles (TV1 and a 2014 Tesla)." Palermo Aff. (Nov. 1, 2017) at 4 n.1, Ex. A to McKnight's Mot. (docket no. 129-2 at 6). The reference to TV-1 is a typographical error. In Palermo's affidavits, TV-1 is otherwise consistently linked to Tables. Palermo meant to indicate that McKnight owned two expensive cars, a 2016 Tesla (TV-2) and a 2014

Tesla. McKnight also points out that, in a footnote in his affidavit dated December 1, 2017, Palermo cross-referenced the wrong previous paragraphs. _See_ Palermo Aff. (Dec. 1, 2017) at 11 n.3, Ex. F to McKnight's Mot. (docket no. 129-7 at 13). These types of typographical errors do not undermine the validity of the affidavits.

### 4. **K9 Lilly**

McKnight contends that K9 Lilly was not certified at the time the "sniffs" at issue were conducted in 2017, and that K9 Lilly's age in 2017 and retirement less than three weeks after her involvement in this case rendered the "sniffs" unreliable. According to Palermo's affidavit dated November 1, 2017, K9 Lilly and his handler were "certified for the detection of narcotics odors, including heroin, crystal methamphetamine, cocaine, and marijuana." Ex. A to McKnight's Mot. (docket no. 129-2 at 9 n.6). McKnight has not presented any evidence to contradict this representation. Indeed, Palermo testified on February 20, 2019, that the statements in his affidavit about K9 Lilly were accurate when they were made and that no contrary information later came to light.

### 5. **Domestic Violence Incident**

McKnight contends that a report related to the April 2017 DV incident referenced in Palermo's affidavit dated December 19, 2017, indicates that McKnight's wife had "kicked him out" of the house located at 2811 31st Avenue South for cheating on her, and that no evidence supports any statement in Palermo's affidavit that McKnight resided in the Mt. Baker neighborhood. _See_ Ex. H to McKnight's Mot. (docket no. 129-9). McKnight further asserts that the SPD reports related to McKnight's arrest in April 2017 do not say anything about the vehicle he was driving at the time.

McKnight's first argument simply misreads Palermo's affidavit. Palermo did not say that McKnight resided at or lived in the Mt. Baker home; he represented only that the Mt. Baker neighborhood was "near a known address" for McKnight, and explained that, because Mt. Baker is a neighborhood in which luxury vehicles are commonly parked on the street, it is an ideal location for "dumping" or leaving unattended one or more of the pool of high-end vehicles being used by McKnight and others in connection with drug trafficking. *See* Ex. G to McKnight's Mot. (docket no. 129-8 at 9).

McKnight's second contention is contradicted by a computer-aided dispatch ("CAD") report related to a DV incident on April 22, 2017, involving McKnight and his son. In his motion to suppress, McKnight referred to SPD General Offense Report No. 2017-140659, Bates Nos. 002836-002894, but he did not include in his supporting materials a copy of the SPD report. The Court telephonically requested that the Government provide a copy of the SPD report and, in doing so, the Government also supplied a copy of the CAD report, Bates Nos. 008401-008408. Both the SPD report and the CAD report had earlier been disclosed to the defense. The CAD report indicates that McKnight's son told the dispatcher that McKnight was driving a black Chrysler and that, approximately five minutes later, a query was run regarding license number AWL2897, which is assigned to TV-7, McKnight's black Chrysler 300. *See* Bates No. 008407; *see also* Ex. G to McKnight's Mot. (docket no. 129-8 at 6) (stating the color, year, make, model, license number, and VIN of TV-7).

During the *Franks* hearing, Palermo stated that the DV reports reflected both the Mt. Baker address and the black Chrysler (TV-7) mentioned in his affidavit dated

December 19, 2017.[5]  McKnight has offered no evidence to the contrary.  The Court

finds that Palermo made no misrepresentation or omission in summarizing the

information contained in the reports relating to McKnight's arrest in April 2017 for a DV

matter.  For the sake of completeness, the Government is DIRECTED to file the April

2017 CAD and SPD reports, redacted as appropriate, within seven (7) days of the date of

this Order.

### 6.   Jump Starting TV-7

With respect to McKnight's assertion Palermo should have included in his

affidavits that what McKnight retrieved from the trunk of TV-7 was jumper cables and a

mobile battery pack so that he could jump start the car, McKnight offers no basis for

believing that Palermo knew such information or deliberately or recklessly withheld it.

In his affidavit dated December 19, 2017, Palermo indicated that McKnight took

something he had retrieved from the trunk of TV-7 over to the engine compartment and

then returned it to the trunk.  During the _Franks_ hearing, Palermo explained that officers

had surveilled TV-7 using a remote-activated camera and that, from the vantage point of

the camera, McKnight's activities near the engine compartment of the vehicle could not

be seen after the hood was raised.  The Court concludes that Palermo did not omit

information that he actually had about McKnight's behavior.

Moreover, although the disclosure that McKnight contends Palermo should have

made would have explained McKnight's conduct, the omission did not render the

---

[5] TV-7 is also registered to McKnight at the Mt. Baker address.

affidavit invalid.  McKnight was also seen retrieving a backpack from the trunk of TV-7

before driving away in TV-4, and was observed placing a small rectangular box in the

trunk of TV-7 when he returned.  Neither of these items were the jumper cables or mobile

battery pack that McKnight suggests Palermo should have mentioned in his affidavits.

Rather, they were items that are consistent with narcotics storage, transportation, and/or

distribution.  In addition, as Palermo testified, jump starting TV-7 was also consistent

with drug activity because it showed that the car had not been driven or moved for a

lengthy period and that McKnight was prepared to get the vehicle started if necessary to

avoid detection.  The Court finds that, even if Palermo had known and disclosed in his

affidavit that McKnight had jump started TV-7, the probable cause analysis would have

produced the same result, namely issuance of a tracking warrant for TV-7.

### 7.  Impoundment of TV-7

McKnight contends that the impoundment of TV-7 constituted an unlawful

warrantless seizure, citing _United States v. Torres_, 828 F.3d 1113 (9th Cir. 2016), and

_United States v. Cervantes_, 703 F.3d 1135 (9th Cir. 2012).  Neither case is on point,[6] and

McKnight's argument lacks merit.  The law has long been established that the existence

---

[6] _Torres_ simply does not support McKnight's position.  In _Torres_, the defendant was arrested for driving under the influence of alcohol and the vehicle he had been driving was impounded.  828 F.3d at 1116-17.  An "inventory" search revealed a stolen firearm.  _Id._ at 1117.  The Ninth Circuit held that, under the "community caretaking" doctrine, the warrantless seizure and search of the automobile did not violate the Fourth Amendment.  _Id._ at 1118-22.  _Cervantes_ also involved a warrantless search of a vehicle without probable cause.  703 F.3d at 1139-40.  The _Cervantes_ Court, however, concluded that the impoundment of the car was not justified by the "community caretaking" exception to the Fourth Amendment's warrant requirement, and the related "inventory" search was held invalid.  _Id._ at 1140-43.  In this case, although the seizure of TV-7 was accomplished without a warrant, the vehicle was not searched until after a warrant was obtained.

of probable cause justifies a warrantless seizure of a vehicle from a public street, even if the car was legally parked; a showing of exigent circumstances is not required. _United States v. Bagley_, 772 F.2d 482, 491 (9th Cir. 1985). The Court concludes that, at the time they impounded TV-7, Palermo and his colleagues had probable cause to believe that TV-7 contained controlled substances and other evidence of criminal activity. They had observed McKnight accessing the trunk of TV-7 in a manner consistent with stashing drugs therein and the scent of narcotics was emanating from the vehicle. Investigators appropriately secured the automobile to avoid the destruction or relocation of suspected contraband and expeditiously sought a warrant to conduct a search of the car.

### 8. **Probable Cause**

McKnight challenges the information contained in Palermo's and Provenzale's affidavits as stale and therefore insufficient to support probable cause. McKnight's assertion lacks merit. The entire investigation was completed in approximately three months, and investigators timely sought tracking or search warrants as the information developed. McKnight was seen engaging in "hand to hand" transactions,[7] including a deal with CS-1, who identified McKnight as "Pizza," a "top dealer" in the area, and he was observed driving four luxury vehicles, TV-2, TV-4, TV-5, and TV-7, the latter two

---

[7] McKnight contends that the written reports of other officers do not corroborate Palermo's statements in his affidavits about McKnight's "hand to hand" transactions. Palermo testified, however, that he sought oral clarification from the other officers about their observations, and Palermo's contemporaneous hand-written notes are consistent with the information contained in his affidavits. If the other officers would actually dispute the accuracy of Palermo's affidavits, the burden was on McKnight to call those officers as witnesses and present such testimony. He did not do so, and the Court finds Palermo's representation that McKnight was observed conducting "hand to hand" transactions to be credible and not deliberately false or made in reckless disregard of the truth.

of which gave off the odor of narcotics.  This evidence provided probable cause for the

issuance of tracking warrants on TV-2, TV-4, TV-5, and TV-7.  After McKnight's Tesla

(TV-2) was seen parked in the space assigned to Unit 406 at the Landes Apartments,

McKnight was surveilled relocating items to and from TV-4 and TV-7, and McKnight

fled in TV-5 to Portland, Oregon, probable cause existed to search TV-2, TV-4, TV-5,

TV-7, Unit 406 at the Landes Apartments, and McKnight's Portland hotel room.  For the

foregoing reasons, McKnight's motion to suppress, docket no. 129, is DENIED.

**D.    Motion to Compel**

Having weighed "the public interest in protecting the flow of information" against

Tables's and McKnight's rights to prepare their defenses, and having taken into

consideration the crimes charged, the possible defenses, the minimal significance of

CS-1's role in the investigation, the Government's decision not to call CS-1 as a witness,

and the need to ensure CS-1's safety, the Court concludes that defendants are not entitled

to disclosure of CS-1's identity.  Moreover, because CS-1 will not testify at trial, no

purpose would be served by requiring the Government to produce information that might

be used to impeach CS-1, which is all that defendants have requested.

The Court is persuaded that none of the materials about CS-1 that Tables and

McKnight seek to compel would undermine the validity of the warrants at issue or

provide a basis to suppress any of the evidence obtained as a result thereof.  The Court is

satisfied that neither Palermo nor Provenzale made deliberately false statements to secure

the warrants or acted in reckless disregard for the truth.  _See McCray_, 386 U.S. at 307-08

(observing that, in deciding whether to issue a warrant, "the magistrate is concerned, not

with whether the informant lied, but with whether the affiant is truthful in his recitation of what he was told" and that a judge hearing a motion to suppress has discretion to determine whether the identity of the informant must be disclosed and/or the informant produced for examination "in order to decide whether the officer is a believable witness").

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     Defendant Patrick Tables's motion to suppress, docket no. 124, is DENIED;

(2)     Defendant Clyde McKnight's motion to suppress, docket no. 129, is DENIED;

(3)     The deferred portion of defendants' joint motion to compel, docket no. 149, is DENIED;

(4)     The period between the filing of Table's motion to suppress on December 3, 2018, and the date of this Order is excluded for speedy trial purposes under 18 U.S.C. § 3161(h)(1)(D);

(5)     The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 28th day of February, 2019.

Thomas S. Zilly
United States District Judge